**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

KELVIN C. BROWN,

                                Plaintiff,                    6:17-cv-01190 (BKS/ATB)

v.

CITY OF UTICA, formerly known as the Utica
Police Department; SGT MARK FIELDS, SGT.,
Special Investigation Unit, Utica Police
Department; INV. PAUL PALADINO,
Investigator, Special Investigation Unit, Utica
Police Department,

                                Defendants.

---

**Appearances:**

*Plaintiff, pro se:*
Kelvin C. Brown
Utica, NY 13501

*For Defendants:*
Zachary C. Oren
First Assistant Corporation Counsel
City of Utica
1 Kennedy Plaza
Utica, NY 13502

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Kelvin C. Brown, proceeding *pro se*, brings this action under 42 U.S.C. § 1983

against Utica Police Department Investigator Paul Paladino, Sergeant Mark Fields, and the City

of Utica ("Defendants") for alleged violations of his Fourth Amendment rights. (Dkt. No. 32).

Specifically, Plaintiff alleges: (1) that Paladino conducted unconstitutionally intrusive body

cavity searches during Plaintiff's arrest on the street and then at the police station (First Claim);

(2) that Fields failed to intervene in the search at the police station (Second Claim); and (3) that

the City of Utica is liable under *Monell*[1] for failing to train its employees to lawfully conduct

anal cavity searches with judicial authorization. (Third Claim). (*Id.*). Presently before the Court

is Defendants' Motion for Summary Judgment. (Dkt. No. 62). For the reasons that follow,

Defendants' motion is granted in part.

## II.     RECORD BEFORE THE COURT

Along with their motion for summary judgment, and as required by Local Rule 56.2,

Defendants provided Plaintiff with a copy of the Northern District of New York's "Notification

of the Consequences of Failing to Respond to a Summary Judgment Motion." (Dkt. No. 62-7).  It

advises that "[a] response to the defendants' statement of material facts" must "admit[ ] and/or

den[y] each of the defendants' assertions in matching numbered paragraphs," and "support[ ]

each denial with citations to record evidence."  (*Id.*) (quoting N.D.N.Y.L.R. 7.1(a)(3)).  Here, in

accord with the Local Rules, Defendants filed a Statement of Material Facts, with citations to the

record for each.  (Dkt. No. 62-9).  In his response Plaintiff admitted one fact—that in the

underlying criminal case, the Oneida County Court suppressed the evidence discovered during

the search.  (Dkt. No. 67-14, ¶ 33; Dkt. No. 62-9, ¶ 33).  Plaintiff responded to all of the other

facts by disputing the fact and citing to the Oneida County Court's decision suppressing the

evidence.  (Dkt. No. 67-14, at 2-6).  Plaintiff filed a Counter-Statement of Material Facts which

included citations to testimony from the Oneida County suppression hearing.  (Dkt. No. 67-14, at

9-19).[2]

---

[1] *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978).

[2] Following Plaintiff's arrest, on November 21, 2017, a combination *Mapp/Huntley* hearing was held. (Dkt. No. 62-5, at 4).  "A *Mapp* hearing tests the constitutionality of the seizure of physical evidence, *see Mapp v. Ohio*, 367 U.S. 643 (1961), while a *Huntley* hearing tests the voluntariness of a defendant's post-arrest statements, see *People v. Huntley*,

Defendants argue that because Plaintiff's responses to their Statement of Material Facts are "inadequate" and fail "to comply with Local Rule 7.1(a)(3)," Defendants' facts must be "deemed true." (Dkt. No. 71, at 3). Under these circumstances, the Court may "deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." Local Rule 7.1(a)(3). While the Court "is not required to consider what the parties fail to point out," in deference to Plaintiff's *pro se* status, the Court has nevertheless conducted "an assiduous review of the record," including Plaintiff's Counter-Statement of Material facts, (Dkt. No. 67-14, at 8–19), to determine whether evidence supports Plaintiff's claims. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). Therefore, the facts have been drawn from the facts in the Defendants' Statement of Material Facts and Plaintiff's Counter-Statement of Facts, which are supported by record evidence, (Dkt. Nos. 62-9, Dkt. No. 67-14), the verified Second Amended Complaint, (Dkt. No. 32), and the exhibits attached to the parties' submissions. The facts are taken in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

## III. FACTS

### A. Plaintiff's Arrest

On the morning of August 14, 2017, Defendant Paul Paladino, who was posing as "Angie." sent Plaintiff text messages. (Dkt. No. 62-3, at 37–38, 40). Paladino texted Plaintiff, "Hey it's Angie. Need 50 hard," referring to the fact that "Angie" wanted to purchase $50 worth of crack cocaine. (*Id.* at 39–40, 89). Plaintiff texted "[g]imme 15 meet u at your house." (*Id.* at 89, 40). Plaintiff and "Angie" arranged to meet by a building on Genesee and Hobart Streets in Utica for "Angie" to buy crack cocaine for $50. (*Id.* at 40, 42). Plaintiff texted "Angie" when he

15 N.Y.2d 72 (1965)." *Timmons v. Lee*, No. 10-cv-1155, 2010 WL 3813963, at *1 n.1, 2010 U.S. Dist. LEXIS 99847, at *2 n.1 (E.D.N.Y. Sept. 23, 2010). The parties both attached the hearing transcript in support of their motions.

arrived, but nobody was there, so Plaintiff waited on Hobart Street for "about ten minutes." (*Id.* at 42). Plaintiff was wearing baggy sweatpants and a baggy t-shirt. (*Id.* at 45). Plaintiff had put hard crack cocaine packaged in plastic, weighing approximately one to two pounds and about the size of "a miniature golf ball," in his buttock crevasse.[3] (*Id.* at 49–50).

After the ten minutes went by, while Plaintiff was still standing on Hobart Street, two uniformed officers, Patrolman Mahay and Defendant Sergeant Mark Fields "appeared simultaneously" in separate cars. (*Id.* at 42–43). Then, according to Plaintiff, two plainclothes police officers, Investigator David Desens and Paladino, arrived in separate vehicles.[4] (*Id.* at 43). Mahay handcuffed Plaintiff with Plaintiff's hands behind his back. (*Id.* at 43–44). About "[t]wo minutes" later, Paladino approached Plaintiff. (*Id.* at 46). At some point (although from Plaintiff's testimony it is not entirely clear when this occurred), Paladino called Plaintiff's cellphone and confirmed that Plaintiff was in possession of the phone Paladino had been texting. (*Id.* at 47, 134, 153).

The parties' versions regarding the search that ensued diverge. Plaintiff testified that Paladino immediately took Plaintiff's phone out of Plaintiff's pocket and began to "search [him] aggressively," particularly in Plaintiff's buttock crevasse. (*Id.* at 46). Plaintiff, who was wearing sweatpants, further testified that he was patted "through the pants" and that Paladino "stuck his thumb up [Plaintiff's] crevasse to see if anything was there." (*Id.* at 45–46). The officers lifted Plaintiff's shirt, exposing his waistline. (*Id.* at 47). Plaintiff started to "yell for help from the

---

[3] At Plaintiff's deposition, the parties stipulated that Plaintiff's "butt crevasse" is "the area between [Plaintiff's] buttock cheeks." (Dkt. No. 62-3, at 30).

[4] Although Plaintiff testified that Desens was present during his arrest, (Dkt. No. 62-3, at 43), the record is unclear as to whether he was. (*See, e.g.*, Dkt. No. 62-4, at 9; Dkt. No. 62-3, at 152).

public," and Paladino "ushered [Plaintiff] in the back seat of the [Mahay's] police car." (*Id.* at 47, 50).

Paladino testified that when he was "checking [Plaintiff's] upper thigh area and buttocks area" during the pat down search, Plaintiff was "clinching [sic] and flexing his hamstrings and his glutes."[5] (*Id.* at 134). Through his "training and experience," Paladino knew that this was a "pretty good indicator that there's some type of contraband concealed within the area of one's person." (*Id.* at 134-35). Paladino could "feel the corner-knotted portion of what [he knew] through [his] training and experience as a plastic bag," in Plaintiff's "upper thigh . . and buttocks area." (*Id.* at 134–35). Paladino testified Plaintiff was wearing "boxer briefs" which work better than loose boxers for individuals who put contraband in their buttocks area. (*Id.* at 155). Paladino testified that after feeling the bulge he "ceased any other actions" and immediately put Plaintiff in the rear of the patrol car to have him transported to the Utica Police Department station.[6] (*Id.* at 135). The parties agree that no officer removed Plaintiff's pants or exposed Plaintiff's buttock or penis in the street. (*Id.* at 46–47; Dkt. No. 62-9, ¶ 19).

### B.    Plaintiff Is Brought to the Utica Police Department Station

Plaintiff was transported to the police station. (Dkt. No. 62-3, at 50). While in the back seat of Mahay's police car, Plaintiff turned his hand in the handcuffs, reached his "hands in the bottom of [his] rectum area, and inserted [his] finger in [his] crevasse and stuck [the package of crack cocaine] all the way into [his] rectum." (*Id.* at 50–51). Although it is not clear from the record whether the officers knew exactly what Plaintiff was doing, Paladino and Fields stopped

---

[5] At his deposition, Plaintiff denied doing so. (Dkt. No. 62-3, at 50).

[6] At the grand jury in Plaintiff's criminal proceedings, Paladino testified that while Plaintiff was being transported, and then while Plaintiff was in the booking area, Paladino "made sure . . . there was a constant visual of Plaintiff" because Paladino "believ[ed] that Plaintiff may be concealing contraband *within* his person." (Dkt. No. 67-10, at 12–13) (emphasis added).

the police car and told Plaintiff to "knock it off." (*Id.* at 51). When Plaintiff arrived at the police station, he was placed in a "holding tank," where he was handcuffed to a railing and "under constant surveillance." (*Id.* at 52, 187).

### C.     Paladino Applies for and Obtains a Search Warrant

While Plaintiff was being held, Paladino applied to the Utica City Court for a search warrant. (Dkt. No. 32, at 6; Dkt. No. 62-3, at 93–95). In the application, Paladino described his arrangement to purchase $50 of cocaine from Plaintiff at a corner in Utica, and Plaintiff's arrest after he arrived at the meet location.  (Dkt. No. 62-3, at 94-95, 161).  Paladino stated that he had "reasonable cause" to search Plaintiff for a "quantity of cocaine." (*Id.* at 93). Paladino did not indicate that he had reason to believe there were drugs inside Plaintiff's buttocks area or his anal cavity, (*id.* at 93-95), and he did not request authority to search inside Plaintiff's buttocks area or anal cavity or to remove any items from Plaintiff's anal cavity. (*Id.*).

At approximately 12:12 pm., a Utica City Court Judge issued a search warrant authorizing officers to search Plaintiff for "a quantity of cocaine."  (*Id.* at 101). According to Paladino, this was a standard search warrant—the kind that would issue were an officer seeking authority to search somebody's pockets. (*Id.* at 167).  There was no reference to any search of Plaintiff's buttocks or anal cavity.  (*Id.* at 101).

### D.     The Search

After obtaining the warrant, Paladino showed it to Plaintiff (*Id.* at 55–56). Paladino, Desens, and Mahay escorted Plaintiff "to the back of the central book in the police precinct" to "an empty cell." (*Id.* at 56). At this point, Plaintiff's hands were cuffed behind his back. (*Id.* at 187). Paladino removed Plaintiff's clothes. (*Id.* at 168, 187). Here, the parties' versions of events again diverge.

According to Plaintiff, with Paladino to his left and Desens and Mahay behind him in the cell, Plaintiff was told to "squat several times" and Paladino "look[ed] in [Plaintiff's] crevasse while he squatted." (*Id.* at 57, 188). According to Plaintiff, as he was squatting, Paladino said that he saw the package in Plaintiff's rectum. (*Id.* at 58). Paladino "kept ushering [Plaintiff] to remove it." (*Id.*). Plaintiff said that he "didn't know what [Paladino] was talking about," so Paladino "left and he went to go get Sergeant Fields," (*id.* at 58–59), who was supervising the operation. (Dkt. No. 62-4, at 10). Plaintiff testified that he did not comply with Paladino's instruction because he did not "want to get prosecution." (Dkt. No. 62-3, at 59).

When Fields arrived, Fields had Plaintiff "turn around and bend over." (*Id.* at 188). This time, instead of squatting, Plaintiff's knees were straight. (*Id.* at 59). While Plaintiff was bent over, officers said to Fields: "'[t]here it goes . . . I see it' . . . or something like that." (*Id.* at 60). According to Plaintiff, Paladino then said, "[w]e know that you have something in your anal cavity. Either you remove it, or I'm going to remove it." (*Id.* at 188). Plaintiff "refused" and said that he "already bent over multiple times" and that he was "not bending over again." (*Id.*). Plaintiff testified that, although he was afraid the package would fall out on its own, it did not. (*Id.* at 196).

Plaintiff testified that, at this point, with his hands still cuffed behind his back, Desens and Mahay "each grabbed one of [Plaintiff's] arms," (*id.* at 60), around Plaintiff's shoulder region while Fields "put his hands in the small" of Plaintiff's back "and tried to force [Plaintiff] to bend over." (*Id.* at 188–89). Plaintiff stated that the officers "[p]ulled [him] down to make [him] actually bend over" and that Fields said "I see it. There it is." (*Id.* at 189). The officers "released" him, Plaintiff stood up, and Paladino "got in [Plaintiff's] face real aggressively" and told Plaintiff: "You going to retrieve the evidence, or we're going to do it." (*Id.*). When Plaintiff

refused, Paladino told Plaintiff to turn around. (*Id.*). After Plaintiff turned around, Paladino "approached [Plaintiff]" and "stuck his finger into [Plaintiff's] rectum and physically pulled out the crack cocaine" while "Fields was watching the whole thing." (*Id.* at 60, 189). According to Plaintiff, Paladino "stuck his finger past the crevasse and inserted it into the rectum and withdr[e]w [the package] with his finger out." (*Id.* at 60–61). According to Plaintiff, as a result of Paladino inserting his index finger into Plaintiff's rectum, Plaintiff, "[a]t the time," had minor bleeding. (*Id.* at 62). Plaintiff estimated that, on a scale from 1 to 10, the pain registered as "[a] 10." (*Id.* at 61). Plaintiff estimated that the search took approximately a half an hour and that the drugs had been in his rectum for "[a]bout an hour and a half." (*Id.* at 58).

Paladino, by contrast, testified the package was visible and that it was "not inside [Plaintiff's] body cavity." (*Id.* at 147). Instead, Paladino testified that the package was stuck to his butt cheek on the "inner left portion," (*id.* at 170–71), "right in the middle of the crack." (*Id.* at 142). Paladino further testified that when Plaintiff was standing up straight, he could not see the drugs in his anus at all and that he could not see the drugs without Plaintiff bending over, which caused his butt cheeks to "naturally spread apart." (*Id.* at 170, 184). Paladino explained that the item was not protruding from Plaintiff's body but rather it was "stuck against [Plaintiff's] body." (*Id.* at 170).

Paladino testified that "after half an hour" of directing Plaintiff to make certain movements, the item was not falling out of Plaintiff because Plaintiff "wasn't allowing it" and that Plaintiff was "flex[ing] the entire time." (*Id.* at 169, 171, 175; Dkt. No. 62-4, at 10). Then, with Plaintiff "bent at the waist" Paladino took his "left hand which was gloved and swiped the contraband onto the ground" with a "mere flick." (Dkt. No. 62-3, at 143, 180). Paladino further testified that there was no physical force employed to convince Plaintiff to bend to his waist. (*Id.*

at 143). Paladino testified that he had to put his finger between Plaintiff's butt cheeks to get the item free, which he agreed required manual manipulation. (*Id.* at 177). Paladino testified that as he removed the package Plaintiff was screaming that Paladino was sticking his "hand into his asshole." (*Id.* at 146). After the item fell to the floor, Paladino picked it up off the ground. (*Id.* at 143–44). Field tests confirmed the item contained cocaine. (Dkt. No. 62-4, at 10).

Plaintiff testified that he later requested medical assistance while at the Oneida County Correctional Facility. (Dkt. No. 62-3, at 62–63). Plaintiff could not recall the precise treatment he received but testified that it "wasn't anything of significance." (*Id.* at 62). This was Plaintiff's only physical injury. (*Id.* at 62–63). Plaintiff further testified that as a result of Paladino's search he suffers "[t]rauma, flashbacks, duress and stress." (*Id.* at 63). He was treated by the "mental health department" at the Oneida County Jail. (*Id.* at 63–64).

### E.      Criminal Proceedings

On September 14, 2017, an Oneida County grand jury indicted Plaintiff on five drug-related offenses. (Dkt. No. 67-11). Plaintiff moved to suppress "all items of physical evidence seized by the police on the grounds that such seizure occurred in violation of his constitutional rights." (Dkt. No. 62-5, at 3). On December 7, 2017, following an evidentiary suppression hearing, Oneida County Court Judge Michael J. Dwyer held that Paladino's warrant application "lacked specific facts to support a reasonable suspicion that defendant had secreted contraband beneath his clothes or in a body cavity." (*Id.* at 22). Judge Dwyer further found that "there is no dispute that the police engaged in a visual body cavity search of the defendant" and that this "specific, intrusive search was not authorized by the language contained in the warrant." (*Id.*). Accordingly, Judge Dwyer suppressed the "crack cocaine seized pursuant to the execution of the search warrant." (*Id.* at 23). All charges against Plaintiff were dismissed. (Dkt. No. 32, at 8).

## IV.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 F.3d at 553–54 (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

## V.     DISCUSSION

### A.     The Encounter on the Street

Defendants move for summary judgment on Plaintiff's Fourth Amendment claim relating to Paladino's actions while frisking Plaintiff on the street. (Dkt. No. 62-10, at 6–14). They argue that Paladino had reasonable suspicion required to pat frisk Plaintiff, and that Paladino detected a bulge while focusing his frisk around Plaintiff's "waistline and buttock area." (Dkt. No. 62-10, at 10). Alternatively, Defendants argue that Paladino's actions were permissible because he was entitled to search Plaintiff incident to arrest. (*Id.* at 11–14). Plaintiff concedes that Paladino was entitled to pat frisk him but argues that Paladino "was not entitled to search the anal region/buttocks area for drugs." (Dkt. No. 67-15, at 8).[7]

#### 1.     *Terry* Frisk

The Fourth Amendment "guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Gomez*, 877 F.3d 76, 85–86 (2d Cir. 2017) (quoting U.S. Const. amend. IV) (alteration in original). Under *Terry v. Ohio*, 392 U.S. 1 (1968), "police may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot, and may frisk him if they reasonably believe he is armed and dangerous." *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)).

---

[7] In their reply brief, Defendants construe Plaintiff to be making (1) an argument regarding collateral estoppel and (2) an argument seeking to apply the exclusionary rule to this action. (Dkt. No. 71, at 7–9, 3–4). The Court does not construe Plaintiff to be making these arguments and thus does not address these issues.

Here, the parties do not dispute that Paladino was permitted to conduct a pat frisk under *Terry* to check Plaintiff for weapons. (Dkt. No. 67-15 at 8). The relevant question here is whether Paladino's frisk went beyond the bounds set in *Terry* of a "carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault him." *Terry*, 392 U.S. at 30; *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992).

Viewing the evidence in the light most favorable to Plaintiff, the Court finds triable issues of fact as to whether Paladino exceeded *Terry*'s circumscribed scope. *See McKelvie*, 190 F.3d at 60–62 & n.2. In *McKelvie*, for example, during an investigative search, one plaintiff described feeling "someone's finger insert right into [his] ass through [his] pants." *Id.* at 60 n.2. The court found "disputed facts . . . material to a determination of the reasonableness of the over-the-clothing, yet invasive 'examination' of a suspect." *Id.* at 62 (footnote omitted). The court explained that, on "the record before" it, the officers' treatment of one of the plaintiffs "went beyond the pat-down or frisk contemplated by *Terry v. Ohio*." *Id.* at 62 n.6.

Here, Plaintiff testified that Paladino patted him "through the pants" and "stuck his thumb up [Plaintiff's] crevasse to see if anything was there." (*Id.* at 46). This is sufficient to raise a material issue of fact as to whether Paladino exceeded a "carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault him." *Terry*, 392 U.S. at 30; *see also United States v. McDow*, 206 F. Supp. 3d 829, 855 (S.D.N.Y. 2016) (holding that an officer's "thorough search of [the defendant's] pockets went significantly beyond the 'carefully limited search of the outer clothing' permitted during a *Terry* stop 'in an attempt to discover weapons.'" (quoting *Terry*, 392 U.S. at 30)).

### 2. Search Incident to Arrest

"[A] search incident to an arrest 'constitutes an exception to the warrant requirement' the Fourth Amendment otherwise imposes." *Sloley v. VanBramer*, 945 F.3d 30, 37 (2d Cir. 2019)

(quoting *Riley v. California*, 573 U.S. 373, 382 (2014)). However, "the scope of a search incident to arrest is limited." *Id.* The "reasonableness of '[t]he search incident to arrest exception rests not only on the heightened government interests at stake in a volatile arrest situation, but also on an arrestee's reduced privacy interests upon being taken into police custody.'" *Id.* (quoting *Riley*, 573 U.S. at 382). To determine "whether a particular search incident to arrest falls within this exception," the Court examines "'the degree to which [it] intrud[es] upon an individual's privacy and the degree to which [it is] needed for the promotion of legitimate governmental interests.'" *Id.* (quoting *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2176 (2016)). A search incident to arrest "must be reasonable in its scope and manner of execution." *Maryland v. King*, 569 U.S. 435, 448 (2013); *Bolden v. Vill. of Monticello*, 344 F. Supp. 2d 407, 417 (S.D.N.Y. 2004) (noting that "[a] lawful arrest . . . creates a presumption of reasonableness regarding an attendant search" that "can be rebutted by a showing that the search was conducted in an otherwise unreasonable manner").

Plaintiff does not contest the fact that the officers had probable cause to arrest him. (*See* Dkt. No. 67-15, at 8). Plaintiff challenges the reasonableness of the scope and manner of the search. A search incident to arrest may consist of "a careful exploration of the outer surfaces of a person's clothing all over his or her body . . . including wasteline [sic] and back, the groin area about the testicles, and entire surface of the legs down to the feet." *Scalpi v. Amorim*, No. 14-cv-2126, 2018 WL 1606002, at *18, 2018 U.S. Dist. LEXIS 53420, at *50 (S.D.N.Y. Mar. 29, 2018) (citations omitted). However, "'unreasonable, non-consensual, inappropriate touching' can constitute 'unreasonable intrusions into a plaintiff's bodily integrity in violation of the Fourth Amendment.'" *Golden v. Cty. of Westchester*, No. 10-cv-8933, 2012 WL 4327652, at *5, 2012 U.S. Dist. LEXIS 133297, at *14 (S.D.N.Y. Sept. 18, 2012) (alterations omitted)

(quoting *Fontana v. Raskin*, 262 F.3d 871, 880–81 (9th Cir. 2001)); *Sorrell v. Cty. of Nassau*, 162 F. Supp. 3d 156, 169 (E.D.N.Y. 2016) (denying summary judgment where a search incident to arrest required "some movement of the plaintiffs' clothing away from their bodies and was 'aimed at uncovering contraband that may have been concealed in [their] undergarments'" (quoting *Mason v. Vill. of Babylon*, 124 F. Supp. 2d 807, 811 (E.D.N.Y. 2000))).

Here, material issues of fact remain as to whether the search incident to arrest was conducted reasonably. Under Plaintiff's account, the search included Paladino sticking his "thumb up [Plaintiff's] crevasse." (Dkt. No. 62-3, at 44, 46). Paladino, on the other hand, testified that during the course of a pat frisk he felt a bulge, which he believed to be a plastic bag, in Plaintiff's buttocks area. The Court finds there are material questions of fact as to whether the search incident to arrest involved just "brief contact with an arrestee's" private area, which courts in this Circuit have held, without more, is "insufficient to violate the Fourth Amendment" or whether a more intrusive and unreasonable search occurred. *Scalpi*, 2018 WL 1606002, at *18, 2018 U.S. Dist. LEXIS 53420, at *48–49 (S.D.N.Y. Mar. 29, 2018) (collecting cases). Accordingly, summary judgment on Plaintiff's Fourth Amendment claim relating to his arrest is denied.

### 3. Paladino's Entitlement to Qualified Immunity for His Alleged Actions on the Street

Defendants argue that they are entitled to qualified immunity for the "search and/or pat frisk of Plaintiff in the field because there was at least probable cause to arrest" Plaintiff and "not all police officers would agree that Defendants' actions violated the Constitution." (Dkt. No. 62-10, at 17). Plaintiff responds that "a reasonable official in that situation would deem there [sic] conduct on [A]ugust 14, 2017, to be unlawful." (Dkt. No. 67-15, at 9).

"Qualified immunity is an affirmative defense on which [Defendants have] the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). At the summary judgment stage, claims of qualified immunity are evaluated "using a two-part inquiry: (1) whether the facts, taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a federal right" and (2) whether the right in question was clearly established at the time of the violation." *Sloley*, 945 F.3d at 36 (quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam)). The Court has discretion to decide "the order in which to analyze the two prongs." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Under either prong of the qualified immunity analysis, the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656.

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. *D.C. v. Wesby*, 138 S. Ct. 577, 589–90 (2018). The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" *Wesby*, 138 S. Ct. at 589–90 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)). While there need not be "'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *Id.* at 590 (quoting *al–Kidd*, 563 U.S. at 741–42); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

At this stage, Paladino is not entitled to qualified immunity as to Plaintiff's claims stemming from his arrest. Viewing the evidence in the light most favorable to Plaintiff, factual disputes remain that bear directly on whether Paladino's conduct (sticking his finger through Plaintiff's pants into his crevasse) violated Plaintiff's clearly established constitutional rights— that is so whether Paladino conducted a frisk under *Terry* or a search incident to arrest. *United States v. Casado*, 303 F.3d 440, 447 (2d Cir. 2002) (finding a Fourth Amendment violation where an officer's purported *Terry* frisk "was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer [and the backup officers] by disarming a potentially dangerous man." (quoting *Sibron v. New York*, 392 U.S. 40, 65 (1968))).

Defendants argue that Paladino had "at least arguable cause" to arrest Plaintiff. But that is not dispositive here. Even a lawful arrest based on probable or arguable probable cause must be carried out in a reasonable manner. *Bolden*, 344 F. Supp. 2d at 417. Accordingly, because material factual issues remain, qualified immunity is denied at this stage. *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004).

## B.     Search at the Station

### 1.     Paladino's Entitlement to Qualified Immunity for the Alleged Manual Body Cavity Search of Plaintiff at the Police Station

Defendants argue that Paladino is entitled to qualified immunity for the search at the police station because, even assuming Paladino violated Plaintiff's constitutional rights, the constitutional violation at issue was not clearly established.[8] (Dkt. No. 62-10, at 14–23). Specifically, Defendants argue that Paladino is entitled to qualified immunity for the search of

---

[8] Defendants note that Paladino disputes sticking his fingers "inside of Plaintiff's anus . . . and thus no Constitutional violation occurred," but because Plaintiff's testimony is that Paladino "actually stuck his fingers inside of Plaintiff's anus," that account "must be taken as true at the summary judgment stage." (Dkt. No. 19 n.5).

Plaintiff at the station because he was (1) entitled to rely on the "validity of the search warrant" and he (2) did not exceed the warrant's scope. (Dkt. No. 62-10, at 21–22; Dkt. No. 71, at 11–12). Defendants further argue that Paladino is entitled to qualified immunity because "reasonable police officers could disagree as to the . . . type of strip search authorized by the search warrant." (Dkt. No. 62-10, at 22–23). Plaintiff argues "a reasonable official would understand that sticking your finger in the buttocks of the Plaintiff to remove an item without judicial consent and under no exigent circumstances violates the fourth amendment's clearly established right to be secure within their persons." (Dkt. No. 67-15, at 9).

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767 (1966). "The Fourth Amendment states unambiguously that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and *the persons or things to be seized*.'" *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (quoting U.S. Const. amend. IV). "The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (internal citations omitted). "If the scope of the search exceeds that permitted by the terms of a validly issued warrant . . ., the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 140 (1990). "A warrant must be executed reasonably; a warrant generally authorizes only what its terms expressly provide; and a warrant's execution terms represent the magistrate's neutral determination of how a warrant is to be executed. A seizure that flouts the plain terms of its authorizing instrument is therefore unreasonable." *Simon v. City of New York*, 893 F.3d 83, 95 (2d Cir. 2018). To determine "the permissible scope of a search that has been authorized by a search warrant," the

relevant inquiry examines "the place that the magistrate judge who issued the warrant intended to be searched, not to the place that the police intended to search when they applied for the warrant." *United States v. Voustianiouk*, 685 F.3d 206, 211 (2d Cir. 2012).

First, viewing the facts in the light most favorable to Plaintiff, Paladino conducted a manual body cavity search at the police station. The Second Circuit has explained that "a 'manual body cavity search' occurs when the police put anything into a suspect's body cavity, or take anything out." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013) (quoting *People v. Hall*, 886 N.E.2d 162 (2008)). Defendants concede that the Court must accept this fact at summary judgment. (*See* Dkt. No. 62-10, at 19 n.6).

The question here, then, is whether any reasonable officer could have believed the warrant issued in this case permitted him or her to reach into Plaintiff's rectum to remove the package from Plaintiff. On the date of these events, no reasonable officer could have believed doing so was lawful.

As the Second Circuit explained in *Voustianiouk*:

> [W]hen officers search a location other than the one that the magistrate judge intended to be searched, as was the case here, there is no need to inquire into whether the warrant's description was sufficiently particular to satisfy the Fourth Amendment in order to determine if the search violated the Constitution, because the search was conducted without the authorization of a warrant.

685 F.3d at 212. Here, Paladino applied for and obtained a warrant to search Plaintiff for "a quantity of cocaine." (Dkt. No. 62-3, at 101). The parties do not dispute the warrant's validity. Rather, Plaintiff complains that Defendants "flouted the express terms of [the] warrant." *Simon*, 893 F.3d at 95. Neither the warrant application nor the warrant referred to any search of Plaintiff's anal cavity. (*Id.* at 93–95, 101). Accordingly, Defendants' argument that qualified immunity attaches because "a neutral magistrate has issued [the] warrant," is unavailing. (*See*

Dkt. No. 62-10, at 20 (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012))). Without relevant supporting information from Paladino, the judge who authorized the warrant could not have contemplated that Paladino intended to search Plaintiff's anal cavity. *See Voustianiouk*, 685 F.3d at 211; *accord Ybarra v. Illinois*, 444 U.S. 85, 90 n.2 (1979).

District courts in this Circuit have rejected this argument based on a warrant's express terms. *Chaney v. Vena*, No. 15-cv-653, 2018 WL 4290455 at *5, 2018 U.S. Dist. LEXIS 85747, at *12 (N.D.N.Y. May 21, 2018) ("The search warrant authorized a search of 'any person' present, but a body cavity search goes beyond the search of one's 'person.' Thus, defendants have not shown that if the search did occur, it was justified."), *report and recommendation adopted*, No. 15-cv-653, 2018 WL 4288621, 2018 U.S. Dist. LEXIS 152411 (N.D.N.Y. Sept. 7, 2018); *see also Bolden*, 344 F.Supp. 2d at 417 (holding that "the existence of a warrant authorizing the search of a person or persons, without more, does not justify the extraordinary invasion of privacy caused by a strip search, let alone a visual or invasive body cavity search"); *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 292 (S.D.N.Y. 2015) (quoting *Bolden*, 344 F. Supp. 2d at 417).

Second, the New York Court of Appeal's decision in *Hall*, applying the Supreme Court's decision in *Schmerber*, further supports that the law was clearly established. In *Hall*, the court held that if "an object is visually detected or other information provides probable cause that an object is hidden inside the arrestee's body . . . a warrant [must] be obtained before conducting a body cavity search unless an emergency situation exists." 10 N.Y.3d at 311. The Second Circuit recently reaffirmed the relevance of state high court decisions to the qualified immunity analysis as applied to officers working in that state. *Sloley*, 945 F.3d at 41–42 (finding the law clearly established and denying qualified immunity for a less intrusive *visual* body cavity search and

explaining that *Hall*, "decided by New York Court of Appeals five years before the search at issue" "tips the balance in this case"); *id.* at 42 (explaining that "'[s]tate court decisions, like the decisions of other federal lower courts, are relevant and often persuasive' authority on the 'clearly established' issue" (quoting *Charles W. v. Maul*, 214 F.3d 350, 357 (2d Cir. 2000))).

Defendants argue that qualified immunity is appropriate because there are "so many permutations of fact that bear upon the constitutional issues of a search." (Dkt. No. 62-10, at 17 (quoting *Gonzalez*, 728 F.3d at 161–62)). However, *Sloley* explained that "*Gonzalez* is not a basis for upholding a qualified immunity defense for a search conducted after *Hall*," which "has been binding authority for [Defendants] since 2008." *Sloley*, 945 F.3d at 42.

In short, any reasonable officer was on notice on the date of the search in this case that he or she needed probable cause that "an object is hidden inside the arrestee's body" and—absent exigent circumstances—a warrant before conducting a manual body cavity search. *Hall*, 10 N.Y.3d at 311. Because Paladino provided no such relevant information in his warrant application, the town court could not have intended to permit such a search, and no reasonable officer could have believed otherwise. *See Voustianiouk*, 685 F.3d at 211; *see also Simon*, 893 F.3d 83, 95 ("[D]isobeying the plain terms of a warrant violates the Fourth Amendment." (quoting *Miller v. Kennebec Cty.*, 219 F.3d 8, 11 (1st Cir. 2000))). Accordingly, Paladino is denied qualified immunity at this stage.

### 2.     Fields's Failure to Intervene

Defendants move for summary judgment on Plaintiff's failure to intervene claim against Fields. (Dkt. No. 62-10, at 23–24). Defendants argue that Fields did not have a reasonable opportunity to intervene because Fields did not participate in procuring the warrant and was not aware of the warrant's language. (*Id.*). Plaintiff responds that Fields had an affirmative duty to intervene to protect his constitutional rights from infringement. (Dkt. No. 67-15, at 12).

Law enforcement officials "have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that any constitutional violation has been committed by a law enforcement official." *Anderson*, 17 F.3d at 557. Whether the officer had a "'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *Id.* (quoting *Anderson*, 17 F.3d at 557). "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Personal involvement, even for a supervisor, may be established if the defendant "directly participated in the infraction." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986)).

Defendants argue that "[t]here is no proof in the admissible record that Defendant Fields actually read the warrant, and thus was not aware of the precise language contained in it." (Dkt. No. 62-10, at 24). The Court agrees. Plaintiff has not adduced any evidence in the record that establishes Fields knew that the warrant did not permit a manual body cavity search. Fields was not in the room when Plaintiff was initially shown the search warrant, (Dkt. No. 62-3, at 56), and there is no evidence in the record suggesting that Fields knew of the warrant's contents from any other source. Moreover, Paladino testified that he filled out the search warrant application himself. (*Id.* at 161; Dkt. No. 62-4, at 9). Accordingly, Plaintiff has failed to demonstrate that Fields had "reason to know," *see Esperanza v. City of New York*, 325 F. Supp. 3d 288, 306

(E.D.N.Y. 2018), that Paladino had applied for a search warrant that only permitted a search of Plaintiff's person. Accordingly, summary judgment is granted as to Fields for Plaintiff's failure to intervene claim.

###### C. *Monell* Claim

Defendants argue that they are entitled to summary judgment on Plaintiff's *Monell* claim, which Plaintiff brings under a failure to train theory. (Dkt. No. 62-10, at 25–28; Dkt. No. 32, at 10). Plaintiff does not respond to this argument, although he does allude to the City's training in his statement of facts. (Dkt. No. 67-14, ¶ 15). In reply, Defendants argue that by failing to respond to their arguments with respect to that claim, Plaintiff has abandoned it. (Dkt. No. 71, at 5–7). In its discretion, the Court reaches the claim's merits. *See, e.g.*, *Talyansky v. Syracuse Language Sys.*, No. 98-cv-526, 1998 WL 460242, at *2 n.3, 1998 U.S. Dist. LEXIS 12646, at *6 n.3 (N.D.N.Y. Aug. 7, 1998), *aff'd*, 199 F.3d 1323 (2d Cir. 1999).

"To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019). "The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "[T]he proper local government that is subject to liability on a given *Monell* claim" is "'those official or governmental bodies who speak with final policymaking authority . . . concerning the action alleged to have caused the particular . . . violation at issue.'" *Bellamy*, 914 F.3d at 757 (quoting *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563

U.S. at 62 (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)).

Policymakers' "continued adherence to an approach that they know or should know has failed to

prevent tortious conduct by employees may establish the conscious disregard for the

consequences of their action—the deliberate indifference—necessary to trigger municipal

liability." *Id.* (quoting *Bryan Cty.*, 520 U.S., at 407) (internal quotation marks omitted). "Without

notice that a course of training is deficient in a particular respect, decisionmakers can hardly be

said to have deliberately chosen a training program that will cause violations of constitutional

rights." *Id.*

  Here, Plaintiff's failure to train claim is premised on the single cavity search conducted

by Paladino at the police station. Notably, the Supreme Court has "left open the possibility that,

'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to

show deliberate indifference" because the unconstitutional consequences of failing to train could

be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing

pattern of violations." *Connick v. Thompson*, 563 U.S. 51, 63 (2011) (quoting *Bd. of Cty.*

*Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)); *Harris*, 489 U.S. at 390 n.10

(explaining a hypothetical situation where "city policymakers know to a moral certainty that

their police officers will be required to arrest fleeing felons" and thus the need to train officers in

the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that

failure to do so could properly be characterized as 'deliberate indifference' to constitutional

rights).

  Here, Plaintiff has failed to establish the "rare" instance of municipal liability for failure

to train based on a single incident. *Connick*, 563 U.S. at 64; *see also Amnesty Am. v. Town of W.*

*Hartford*, 361 F.3d 113, 130 (2d Cir. 2004) (Sotomayor, J.) (explaining that failure to train

liability requires that the "inadequate training and causation be based on more than the mere fact that the misconduct occurred in the first place"). Furthermore, Plaintiff has failed to adduce evidence of a "a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (quoting *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006)). By contrast, Defendants have come forward with an affidavit explaining the Utica Police Department's training and accreditation processes. (Dkt. No. 62-6, at 2–3). Accordingly, summary judgment on Plaintiff's *Monell* claim is granted.

## VI. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 62) is **GRANTED** as to Plaintiff's *Monell* claim (Third Claim); and it is further

**ORDERED** that Plaintiff's *Monell* claim (Third Claim) is **DISMISSED with prejudice**; and it is further;

**ORDERED** that Defendant City of Utica is **DISMISSED** from the case; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 62) is **GRANTED** as to Plaintiff's Failure to Intervene Claim against Defendant Mark Fields (Second Claim); and it is further

**ORDERED** that Defendant Mark Fields is **DISMISSED** from the case; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 62) is otherwise

**DENIED**.

**IT IS SO ORDERED.**

Dated: March 4, 2020
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge